BDM:KKO
F. #2019V000561

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - -X

In re the Seizure of:

ANY AND ALL FUNDS ON DEPOSIT IN
WELLS FARGO BANK N.A. ACCOUNT
NUMBER 2035585328 HELD IN THE NAME
OF MINIMUNDO INTERNATIONAL CORP.,
AND ALL PROCEEDS TRACEABLE
THERETO.

- - - - - - - - - - - - - - - - - - - - - -X

**UNDER SEAL**

**AFFIDAVIT IN SUPPORT OF
APPLICATION FOR
SEIZURE WARRANT**

19-M-227

EASTERN DISTRICT OF NEW YORK, SS:

RYAN J. TALBOT, being duly sworn, deposes and states as follows:

1.  I am a Special Agent with the Internal Revenue Service, Criminal Investigation Division ("IRS-CID") and have been so employed since August 1998. My responsibilities as a Special Agent include the investigation of criminal violations of the Internal Revenue Laws (26 U.S.C. § 7201 *et seq.*), the Bank Secrecy Act (31 U.S.C. § 5311 *et seq.*), the Money Laundering Control Act (18 U.S.C. §§ 1956, 1957, and 1960), the USA PATRIOT Act of 2001, and related offenses.

2.  I have completed twenty-four weeks of specialized training at the Federal Law Enforcement Training Center in Glynco, Georgia. This training focused on the various criminal violations investigated by IRS-CID Special Agents and included training in investigating financial crimes, money laundering and asset forfeiture, as well as criminal statutes, constitutional law, investigative tools and techniques, interviewing, and debriefing

1

of witnesses. In addition to this initial training, I have attended yearly continuing professional education training from IRS-CID and other agencies, such as the Department of Justice Money Laundering and Asset Recovery Section, dealing with tax and money laundering investigations, the Bank Secrecy Act, civil and criminal forfeiture, and other federal violations. I have also provided instruction on money laundering and Bank Secrecy Act violations to various law enforcement officers as well as professionals employed in the banking and accounting community. I have passed the Certified Anti-Money Laundering Specialist Examination given through the Association of Certified Anti-Money Laundering Specialists. I have been assigned to a Drug Enforcement Administration Financial Investigations Group ("DEA FIT") since January 2005.

3. As a Special Agent, I am a Federal Law Enforcement Officer within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the enforcement of the criminal laws of the United States and thereby authorized to request the issuance of federal seizure warrants.

4. The information contained in this affidavit is based on statements and information from witnesses, my personal knowledge and observations during the course of this investigation, my personal training and experience as a criminal investigator, and my review of records, documents, and other physical evidence obtained during this investigation.

5. Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested seizure warrant, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth herein only those facts which I believe are necessary to establish probable cause to support the warrant requested herein.

## PURPOSE OF THE AFFIDAVIT

6. I make this affidavit in support of the government's applications for the issuance of a seizure warrant for the following property:

> Any and all funds on deposit in Wells Fargo Bank N.A. Account Number 2035585328 held in the name of Minimundo International Corp. ("Minimundo"), and all proceeds thereto (the "SUBJECT ACCOUNT");

7. As set forth below, there is probable cause to believe that the SUBJECT ACCOUNT is subject to seizure and forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) as property involved in transactions in violation of 18 U.S.C. § 1960 (prohibition of unlicensed money transmitting businesses), or property traceable to such property.

## STATUTORY FRAMEWORK

8. Title 18, United States Code, Section 1960(a) prohibits knowingly conducting, controlling, managing supervising, directing, or owning all or part of an unlicensed money transmitting business.

9. Title 18, United States Code, Section 1960(b)(1)(A) and (B) define an "unlicensed money transmitting business" as a "money transmitting business which affects interstate or foreign commerce in any manner or degree" that (A) "is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable" or (B) "fails to comply with the money transmitting business registration requirements" arising under Title 31, United States Code, Section 5330, or regulations promulgated thereunder.

10. Pursuant to Title 18, United States Code, Section 1960(b)(2), "the term 'money transmitting' includes transferring funds on behalf of the public by any and all means including but not limited to transfers within [the United States] or to locations abroad by wire, check, draft, facsimile, or courier."

11. The majority of States, including Florida, require money transmitting businesses to obtain a license and comply with other regulatory requirements that apply to such licensed entities, and punish the unlicensed operation of a money transmitting business as a misdemeanor or felony. Chapter 560 of the Florida Statutes governs money services businesses. Fla. Stat. §§ 560.101 *et seq.* Section 560.125 prohibits a person from engaging in the business of a money transmitter without being licensed by the Florida Office of Financial Regulation (the "Florida OFR"). Fla. Stat. § 560.125(1).

12. A person who violates Section 560.125 by engaging in the business of a money services business without a license commits a felony. Specifically, the penalties for violating this statute are as follows: (1) if currency or payment instruments exceed $300 but are less than $20,000 in any 12-month period, the person has committed a third-degree felony; (2) if currency or payment instruments total or exceed $20,000 but are less than $100,000 in any 12-month period, the person has committed a second-degree felony; and (3) if currency or payment instruments total or exceed $100,000 in any 12-month period, the person has committed a first-degree felony. Fla. Stat. § 560.125(5)(a)-(c).

13. Under Chapter 560, the term "money services business" includes any person located in or doing business in Florida, from Florida or into Florida from other states or countries, who acts as a payment instrument seller, foreign currency exchanger, check casher, or money transmitter." Fla. Stat. § 560.103(22).

14. Under Chapter 560, the term "money transmitter" includes "a corporation, limited liability company, limited liability partnership, or foreign entity qualified to do business in [Florida] which receives currency, monetary value, or payment instruments for the purpose of transmitting the same by any means, including transmission by wire, facsimile, electronic transfer, courier, the Internet, or through bill payment services or other businesses that facilitate such transfer within this country, or to or from this country." Fla. Stat. § 560.103(23).

15. Pursuant to Title 31, United States Code, Section 5330, and Title 31, Code of Federal Regulations, Section 1022.380, all money services businesses, including money transmitters, must register with the Financial Crimes Enforcement Network ("FinCEN"), irrespective of whether or not the business is licensed as a money services business in any state.

16. Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture all property involved in or traceable to a transaction or attempted transaction in violation of Title 18, United States Code, Section 1960.

17. In any forfeiture action in which the subject property is cash deposited into a financial institution, the government is not required to identify the particular funds involved in the offense, as any funds found in the same account within one year of the date of the offense are subject to forfeiture pursuant to Title 18, United States Code, Section 984.

## MONEY LAUNDERING

18. Narcotics traffickers accumulate large cash proceeds from the sale of narcotics in the United States. The traffickers, or those associated with the traffickers,

frequently attempt to give these proceeds the appearance of legitimacy by "laundering" them so that they appear to have been generated by a legitimate source. The traffickers must also devise various methods to remit those narcotics proceeds to suppliers of narcotics located in Colombia and other South American countries, including Venezuela, which are known source locations of narcotics, without alerting government or law enforcement agencies in either country.

19. In order to accomplish this goal, narcotics traffickers frequently utilize domestic and foreign banks and/or financial institutions in an attempt to make their narcotics proceeds appear to be from legitimate sources and to move the narcotics proceeds through the financial system into the countries where narcotics are manufactured.

20. A popular method to launder narcotics proceeds is for narcotics traffickers, through a third party, to "sell" their narcotics proceeds in the United States for pesos in Colombia. This practice, commonly known as the Black Market Peso Exchange ("BMPE"), is centered on a BMPE broker who can bring the drug proceeds and the legitimate pesos together.

21. In a common BMPE scheme, a BMPE broker will identify a South American businessperson, who imports goods from places such as the United States, China, or Panama. The BMPE broker will offer the South American businessperson an opportunity to pay the debt owed to the exporter in the foreign country at a significant discount compared to making the payment through a South American bank. The South American businessperson who agrees to this scheme will then turn over the payment for the imported goods in the form of pesos to the BMPE broker who in turn will contact a Drug Trafficking Organization ("DTO"). When the BMPE broker contacts the DTO, the broker will offer the

6

pesos in South America in exchange for the narcotics proceeds that are located in the United States.

22. The BMPE broker will then arrange to have the narcotics proceeds picked up by a member of the BMPE broker's organization. These money pick-ups will usually occur between two people who have never met before and will most likely never meet again. These pick-ups frequently involve several hundred thousands of dollars in narcotics proceeds.

23. Following the money pick-up, the BMPE broker arranges to forward those funds to the exporter in the United States. This is frequently accomplished by remitting those funds to the exporter through a third party. Frequently, these third parties are found in different geographical locations, where the DTO is located, which avoids the transportation of illicit dollars to the location where the exporter is located.

24. A trade-based money laundering scheme similar to the Colombian-based BMPE exists in Venezuela. The Venezuelan-based Black Market Bolivars Exchange ("BMBE") operates on much the same premise as the BMPE. Specifically, businesses and individuals in Venezuela in need of dollars to purchase goods or services from vendors in the United States or from vendors in other countries who prefer to receive payment in United States Currency can purchase dollars from "money exchangers" or "money brokers" located in Venezuela. In Venezuela, foreign currency exchanges are prohibited by the Venezuelan Government unless conducted through the Central Bank of Venezuela. Venezuelan money brokers facilitate payment for such goods and services using the United States dollars from various sources including drug trafficking organizations. As part of the BMBE, funds are frequently "layered" through unlicensed money remitters that receive wire transfers from

7

accounts located abroad and remit those funds, less a commission, to accounts located in the United States and abroad, at the direction of the BMBE brokers for the ultimate benefit of purchasers of the dollars located in Venezuela.

25. The use of off-shore entities to facilitate the layering of BMBE transactions makes it difficult to trace the source of funds involved in the transactions. Many of these off-shore entities are located in jurisdictions with strong bank secrecy laws. Verifying the true ownership of these off-shore companies and source funds in a BMBE transaction is nearly impossible, creating an inherent risk for United States banks which allow their customers to participate in such transactions. As such, these transactions pose an inherent money laundering threat. Many banks who allow their customers to engage in such high-risk transactions institute enhanced due diligence procedures and continuous monitoring of the customers' activities for suspicious activity.

26. I believe, based on information in this affidavit and on the investigation conducted, that the SUBJECT ACCOUNT was and is currently being in connection with BMBE transactions.

## BACKGROUND OF THE INVESTIGATION

27. Lucy Ramirez is a citizen of Venezuela. Information obtained from U.S. immigration authorities indicates that Ramirez applied for a non-immigrant visa on or about July 15, 2015, and was granted this visa, along with an employment authorization document. Ramirez stated in the application that she has had a business in Venezuela for several years importing home goods and appliances. Ramirez arrived in the United States for the first time on or about January 18, 2016, and returned to Venezuela eleven days later on or

8

about January 29, 2016. Ramirez returned to the United States on or about May 2, 2016, and is presently residing at 10333 NW 89th Terrace, Doral, FL, according to state of Florida records.

28. Minimundo was incorporated in the State of Florida on or about January 27, 2016. The incorporation documents list Lucy K. Ramirez as the president and registered agent. The principal address for the business and incorporator/registered agent was listed as 6810 NW 82 Ave., Miami, FL 33166. According to the incorporation documents, the purpose for which this corporation is organized is "any and all lawful business." The current annual report on file with the State of Florida Corporation Commission lists only Ramirez as the current director, as well as the only officer of the corporation.

29. In early 2017, Ramirez and her company Minimundo became the focus of an investigation conducted by the DEA FIT group because of their activity as an unlicensed money remitter involved with the BMBE. On or about March 9, 2017, as a result of this investigation, three seizure warrants were issued in the U.S. District Court for the District of Massachusetts authorizing the seizure of bank accounts at Bank of America in the name of Minimundo and Ramirez on the grounds that they were used to operate an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960(b)(1). The seizure warrants were served on Bank of America on March 22, 2017.

30. During the previous investigation, agents learned that the Bank of America Minimundo accounts had numerous deposits made to them by individuals other than Ramirez. These deposits consisted of money orders purchased from money service businesses located in New York, and deposited into the Minimundo accounts while Ramirez

9

was outside of the United States. The money orders were all in amounts less than $10,000.00. However, they were deposited in the Minimundo accounts at different Bank of America branches, resulting in aggregate amounts that were at least $10,000. The purchase of smaller money orders and deposits in multiple locations appears to have been intended to circumvent currency reporting requirements. Once deposited, these funds were then transferred to other accounts.

31. During the previous investigation, Carlos Bello who owns Trans Andes Cargo was interviewed. Bello was shown two checks from Bello's bank account totaling $10,000 and payable to Minimundo. Bello stated that the checks were payments to Ramirez for Venezuelan Bolivar to U.S. dollar exchange transactions.

32. On or about January 18, 2019, a DEA FIT Investigator accessed the Florida OFR's online search portal at http://real.flofr.com/ and conducted a search for Lucy Karin Ramirez, Lucy Karin Medina, Lucy Karin Ramirez-Medina, Minimundo and Minimundo International Corp., along with other variations of these individual and business names. None of the names included in the search matched a person or entity regulated by Florida OFR.

33. On or about January 19, 2019, the same DEA FIT Investigator accessed FinCEN's online listing of registered money services businesses at https://www.fincen.gov/financial_institutions/msb/msbstateselector.html and conducted a search for the same names and variations for both Lucy Karin Ramirez and Minimundo. This search also indicated that neither is registered as a money service business with FinCEN.

## THE SUBJECT ACCOUNT

34. In or around December 2018, your affiant learned that Ramirez was continuing the same banking activity that was the subject of the prior investigation which had led to the seizure of the Minimundo and Ramirez Bank of America accounts.

35. On or about June 2, 2016, the SUBJECT ACCOUNT was opened in the name of Minimundo International Corporation listing the address of 6810 NW 82nd Ave., Miami, Florida. Lucy K. Ramirez was listed as the sole owner and signor on the account. Minimundo is described in the bank records as a wholesale trade company involved in an import/export business. Records show that Minimundo was listed as being incorporated on or about January 27, 2016, and having an annual gross sales of $500,000.00.

36. A review of the SUBJECT ACCOUNT records show minimal activity from approximately December 1, 2016 until March 2017. From March 17, 2017 through March 20, 2017, $25,000.00 in cash was deposited into the SUBJECT ACCOUNT in roughly ten separate transactions. These transactions occurred over four days at eight different Wells Fargo branches in New York, by four different individuals, none of whom was Ramirez. On or about March 22, 2017, $15,000.00 in cash was withdrawn from the SUBJECT ACCOUNT at a Wells Fargo branch in Doral, FL and then on or about March 24, 2017, an additional $3,600.00 in cash was withdrawn from the SUBJECT ACCOUNT at a Wells Fargo Branch in Doral, FL.

37. From April 21, 2017 through October 24, 2018, approximately $5,137,265.97 was wired into the SUBJECT ACCOUNT through roughly 56 transfers from approximately 30 different companies. From June 22, 2017 through November 30, 2018, approximately $4,353,087.56 was wired out of the SUBJECT ACCOUNT in roughly 59

transactions to approximately 36 different companies' or individuals' bank accounts. The main recipient of these wire transfers was Job Supply Inc., which received approximately $1,236,144.26 in roughly nine separate wire transfers from the SUBJECT ACCOUNT. Globaldeg Logistics received approximately $227,000.00 total in two separate wire transfers made from the SUBJECT ACCOUNT. Both Job Supply and Globeldeg previously received wire transfers from the Minimundo Bank of America accounts.

38. On or about June 6, 2017, $20,000.00 in cash was deposited into the SUBJECT ACCOUNT at five different Wells Fargo branch banks located in New York, through six different deposits by individuals other than Ramirez. On or about the same day, a check in the amount of $21,500.00 was issued from the SUBJECT ACCOUNT to a company called General Industry Supply. This company previously received transfers from the Minimundo Bank of America accounts.

39. On or about June 20, 2017, three cash deposits in various amounts totaling approximately $20,000.00 were made to the SUBJECT ACCOUNT, at three different Wells Fargo branch banks, one in Orlando, FL and two in Kissimmee, FL. On or about June 21, 2017, two separate cash deposits totaling $15,780 were made at a Wells Fargo branch bank in Stockbridge, GA. On or about June 22, 2017, two separate cash deposits totaling approximately $14,220.00 were made at two different Wells Fargo branch banks in Kissimmee, FL. The sum of these seven cash deposits on or about June 20, June 21, and June 22, 2017 was approximately $30,000.00. Later, on June 22, 2017, a wire transfer was made by Ramirez from the SUBJECT ACCOUNT in the amount of approximately $39,979.82 to Job Supply.

40. On or about October 5, 2018 and October 9, 2018, the SUBJECT ACCOUNT received deposits at various locations throughout the United States, including Wells Fargo branches located in Palm Harbor, FL, Newark, NJ, Houston, TX, Henderson, NV, Eureka, CA, Charlotte, NC, Huntsville, AL, Seattle, WA, Mesa, AZ, San Antonio, TX, Albuquerque, NM, Orlando, FL, Midlothian, GA, and New York, NY. There were roughly ten deposits on October 5, 2018 and seven deposits on October 9, 2018. The total amount deposited was approximately $83,983.00, with three of the deposits being cashier's checks totaling $23,500.00 and the remaining $60,483.00 being made in roughly fourteen individual cash deposits.

41. One of the cashier's checks deposited on or about October 9, 2018 in the amount of approximately $9,000 at a Wells Fargo branch in New York, NY was conducted by an individual later identified as Alexander Hernandez. On December 22, 2018, a traffic stop of Hernandez was conducted by the Westchester County, New York Police Department ("WCPD") for traffic violations. Following the traffic stop Hernandez was arrested for operating on a suspended license. An inventory search of the vehicle following the arrest by the WCPD discovered a duffel bag containing approximately $190,000 in cash and deposit tickets for various bank accounts.

42. The following is a summary of the transactional activity (exclusive of bank fees), in the SUBJECT ACCOUNT from approximately October 5, 2018 through October 18, 2018:

| Date of Transaction | Description | Type | Location | Debits | Credits |
|---|---|---|---|---|---|
| 10/5/2018 | Deposit | Cash | Palm Harbor, FL | | $6,000.00 |
| 10/5/2018 | Deposit | Cash | Newark, NJ | | $4,100.00 |

13

| Date | Type | Method | Location/Name | Debit | Credit |
|---|---|---|---|---|---|
| 10/5/2018 | Deposit | Cash | Houston, TX | | $1,100.00 |
| 10/5/2018 | Deposit | Cash | Henderson, NV | | $5,000.00 |
| 10/5/2018 | Deposit | Cash | Eureka, CA | | $4,000.00 |
| 10/5/2018 | Deposit | Cash | Charlotte, NC | | $2,360.00 |
| 10/5/2018 | Deposit | Cash | Huntsville, AL | | $4,800.00 |
| 10/5/2018 | Deposit | Cash | Seattle, WA | | $9,950.00 |
| 10/5/2018 | Deposit | Cash | Meza, AZ, | | $2,800.00 |
| 10/5/2018 | Deposit | Cash | Eureka, CA | | $923.00 |
| 10/9/2018 | Deposit | Cash | San Antonio, TX | | $9,900.00 |
| 10/9/2018 | Deposit | Cash | Albuquerque, NM | | $1,050.00 |
| 10/9/2018 | Deposit | Cashier's Check | Orlando, FL | | $5,000.00 |
| 10/9/2018 | Deposit | Cash | Midlothian, VA | | $8,500.00 |
| 10/9/2018 | Deposit | Cashier's Check | Orlando, FL | | $9,500.00 |
| 10/9/2018 | Deposit | Cashier's Check | New York, NY | | $9,000.00 |
| 10/9/2018 | Online Transfer | | Gregoria Ereu | -$140.00 | |
| 10/9/2018 | Online Transfer | | Lucy Ramirez | -$3,500.00 | |
| 10/10/2018 | Wire Transfer In | | Agente DE Remesas Y Cambio Capla SA | | $100,000.00 |
| 10/11/2018 | Deposit | Cashier's Check | New Brunswick, NJ | | $48,000.00 |
| 10/11/2018 | Deposit | Cash | New Brunswick, NJ | | $52,000.00 |
| 10/12/2018 | Wire Transfer Out | | Induchem Corp | -$47,005.71 | |
| 10/15/2018 | Wire Transfer Out | | Luis Lopez | -$34,000.00 | |
| 10/18/2018 | Wire Transfer Out | | Distover Medical | -$6,044.00 | |
| 10/18/2018 | Wire Transfer Out | | Induchem Corp | -$29,412.00 | |
| 10/18/2018 | Wire Transfer Out | | Grown Up Toys LLC | -$59,179.00 | |
| 10/18/2018 | Wire Transfer Out | | Openlink Networking Services | -$100,443.00 | |
| | | | **TOTALS:** | **-$279,723.71** | **$283,983.00** |

43. A review of debit card purchases from the SUBJECT ACCOUNT shows expenditures mostly made for personal items, meals, and travel by Ramirez. During the period of December 1, 2016 through November 30, 2018, roughly 619 debit purchases totaling approximately $178,374.90 were charged to the SUBJECT ACCOUNT.

44. A review of checks drawn on the SUBJECT ACCOUNT show that, although some personal checks were written to individuals, there were also checks written to General Industry Supply (approximately $21,500.00 on or about December 18, 2017), Globaldeg Logistics (approximately $81,395.00 on or about January 17, 2018) and Job Supply Inc. (approximately $134,191.61 on or about January 17, 2018).

45. Based on my training and experience, the pattern of large wire transfers into the SUBJECT ACCOUNT, followed by wire transfers out of this account, together with cash deposits directly into this account from various locations throughout the United States, is consistent with the use of the SUBJECT ACCOUNT by individuals other than Ramirez as part of an unlicensed money remitter network.

46. Based upon the foregoing, there is probable cause to believe that the SUBJECT ACCOUNT constitutes property involved in or traceable to violations of Title 18, United States Code, Section 1960, and are therefore subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A).

47. Accordingly, pursuant to Title 18, United States Code, Section 981(b), I respectfully request that the Court issue a warrant authorizing the seizure of any and all funds in the SUBJECT ACCOUNT.

Dated: Brooklyn, New York
      March 14, 2019

*Ryan A Talbot*
Ryan J. Talbot
Special Agent
Internal Revenue Service, Criminal Investigation

Sworn and subscribed to before me this
14th day of March 2019  by telephone

_____
HONORABLE RAMON E. REYES, JR.
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK